This is the case of Cindy Flick v. Southern Illinois Healthcare, doing business with Southern Illinois Hospital Services, Inc. And we have, for the appellant, we have Douglas Gill. And for the appellee, we have Sherry Rode. Are you both prepared to proceed? You may do so. Justice Cates has a back issue, so if she's up and down, don't be concerned. It's more than a back issue. She's recovering from surgery. Thank you. You may please record. Your Honor, this is a retaliatory discharge case. Ms. Flick was hired by the defendant in 2000, in the fall of 2000. And she continued to work there for about three years. She was originally hired as the lab manager at Memorial Hospital of Carbondale. That was her initial responsibility. About a year and a half after she started working there, there was a plan to consolidate Memorial Hospital of Carbondale's lab with St. Joseph's Hospital and Heron Hospital. And that consolidation process had begun. And it went fairly smoothly up until 2003. One of the main duties that Ms. Flick was responsible for was quality control and quality assurance. And it came out through the evidence and discovery in this case that that's actually one of the most important functions of her job, was to ensure quality control and quality assurance. With regard to this consolidation, the first part of that consolidation involved St. Joe's, and like I said previously, that went fairly smoothly. And then, in 2003, the process of consolidating some of Heron Hospital's functions with Memorial Hospital of Carbondale's also had started. And it was during that time that Dr. Padma Laksa, who was the medical director, and who Ms. Flick answered to, requested some reports from Heron Hospital and their lab. And it was noted at that time, and this was in June of 2003, that there hadn't been any of these reports since January of that year. During that first three years, Ms. Flick received a promotion, like I said, about a year and a half after she was hired by the defendant. She was given the responsibility over not just Memorial Hospital of Carbondale, but also over St. Joe's and Heron Hospital. These first three years, she received her annual evaluations in April, and it should be noted by the court that the first two were favorable. The third one she received was very favorable. Out of 100 points that were available to her, she received 98. And during that year of 2003, after she started getting these reports, it was noted that Heron Hospital's lab was not reporting the results properly, and there were some problems with that. And Ms. Flick took continuing, progressive steps towards correcting that. And she reported this to not only her supervisor, who was George Moroney, she had also discussed it with the administrator over at Heron Hospital, who was Becky Ashton, and had discussed it with Dr. Pat Malafa, who was brought in during several meetings, and was also the subject of several emails. The person who had offered the Heron Hospital lab was Al Green, and she had also talked to him and discussed this with him and tried to prompt him to correct these deficiencies. To no avail. She offered to help him. Her offers of help were refused. And eventually, she formulated a written corrective action plan and submitted that to Mr. Green. Still, the problems were not being corrected. In fact, they seemed to be getting worse. And eventually, she documented some counseling and sent that in an email to her supervisor, and that was on November 4th of 2003. Six days after she had sent that was when she was offered this first severance agreement. The big issue in this case is whether or not the offer of the severance agreement was in retaliation for her activities in trying to correct these problems that they were having that were violations of Federal Clinical Laboratory Improvement Act standards. And it's after she has this separation agreement that she makes the helpline call? That is correct, Your Honor. It's not before? It was not before. Her contention and her allegations from the outset of this case were that she began engaging in protective activity in June of 2003. June, July, August, September, October, all the way to November, she was taking these progressive steps in trying to correct the problems at the Heron Hospital lab. As she was trying to correct these problems, they, in fact, were getting worse. But presumably, these would be problems that the employer wanted corrected as well. Presumably. But for whatever reason, they were not being corrected, despite her being vocal about it to her supervisors and the administrator at the Heron Hospital lab. What we have to understand here is that at the same time she was trying to correct these problems, the consolidation of the Heron Hospital lab was also occurring. Important functions and profitable functions of the Heron Hospital lab were being transferred to the Memorial Hospital Department building. And in the process of this consolidation, also people were being reassigned or perhaps being demoted in some instances because of the streamlining of what was going on in the consolidation, which had been tried in the past and had not succeeded. So you believe that the activities were protected activities before there was ever a request that she resign? Yes, Your Honor. The allegations in the complaint, the allegations all along have been that she engaged in protected activity from June of 2003 all the way up until she was presented with the severance agreement on November 10th of 2003. It seemed to me that Judge Salverson ignored that argument. She did, and that was brought out in my brief that she seized on this helpline complaint, and she said that plaintiffs alleged that it was retaliation for her reporting it to the helpline complaint. She's never alleged that. She admits that she didn't report this to the helpline until after she was offered the severance. She was offered the severance. She was given 21 days to consider it. Two days after she was offered the severance was when she made the helpline complaint, and in her helpline complaint, she alleged that she was being retaliated against by being offered this severance. On November 18th, which would have been eight days after she was offered the severance, way before the 21 days was up, George Moroney pulled her into his office and asked her if she had made her decision yet, and at that time she said no, she hadn't, and that's when she was told, well, you're fine. Just go back to work. Didn't hear any more about it. Very telling is that the 98 out of 100 on the evaluation that she received in April and the prior favorable evaluation, she had received pay raises. There was no hostile work environment. From that point forward, this was, granted, the first three years she worked there, the last two years it was a completely different work environment. Hostility from her supervisor, her evaluation went from 98 to a 72 on the very next evaluation, and her last evaluation was also a low score. But it wasn't the same work environment. There were other things going on. At some point, her supervisory role was expanded to more additional labs, right? That is correct. And then they had this computer conversion program conversion going on. And it's our contention that the computer conversion program was the initial reason she was given for her ultimate determination. But our contention is that that was a pretext for the actual reason, which was the retaliation. Plain and simple argument in this case is that... Excuse me, and I'll let you go ahead with your argument. I've just got to get something straight in my mind. When was her supervisory role expanded to include the other two labs? That was about a year and a half after she started there. She started in November of 2000, so that would have been mid-2002, I believe. Before the separation agreement was presented? That's what I heard. It was before the separation agreement was presented that she was given this authority? Yes. Isn't it, even in her performance evaluation where she had a 98, it seemed that they were critical of her management style. Is that true? There was one comment about you need to perfect your people skills. To me, that suggests that they were good, but she needed to perfect them. If they weren't perfect, there were some areas of improvement. And then those seemed to get, the voices behind those comments seemed to get louder and stronger after she made this complaint. After she made this complaint. I mean, Dr. Padmalatha was saying, you know, her management skills are bad. Somebody said that we had to have a meeting, people were threatening to quit. Is that all true? There were several depositions taken in this case, Your Honor. And all the people that were deposed, save one, still worked for the defendant. However, that being said, yes, there were some things brought out in the deposition about opinions as to why she was ultimately terminated. Again, the argument is that there was a turning point in her career. And that was November 10, 2003, when she was presented this severance agreement. And summary judgment was granted in this case, saying that there was no causal connection. There are cases, a line of cases, that say when there's no temporal connection, close proximity to the protected activity and the ultimate termination. But our whole argument here is that she was presented a severance agreement fully expecting that she would accept it and be terminated and move on. She didn't do that. She didn't accept it. She continued to work for the employer. But the employer never backed down from their desire to terminate her. And the whole reason for the termination, plaintiff believes, was retaliation for her activity in trying to enforce these clear regulations. And the mental case that the plaintiff cited in her brief basically says that the passage of time doesn't insulate the employer from liability. Essentially, it could go to the weight of the argument. The more time that passes, perhaps, the more attenuated and the less likely that the plaintiff would be able to show that. But in this case, there was never a break in the conduct. It was from November 10, 2003. It was a turning point in her career. And the defendant's request for her resignation was the beginning of the end. Four evaluations, no support from her supervisor. There was even an instance in one of her subsequent evaluations where her supervisor, who gave her the evaluations, went to the people who worked for her to seek input for her evaluation. Why do you consider that so ominous? Inappropriate? Mr. Moroney admitted himself in his deposition that that was inappropriate, that typically you would go to those who are over-supervising the person to seek input on their evaluation, not the people that work under you. So you believe that this firing was pretextual. The only thing we have to find is that there's a genuine issue of fact as to the firing. Right, Your Honor. What is that genuine issue of fact? The genuine issue of fact is that the plaintiff has come forth with evidence, the evaluations, the demeanor of the plaintiff's supervisor, no support from her supervisor, etc., as evidence of retaliatory conduct, the hospital work environment, etc. The defendant has stated that its reason given in this lawsuit was basically, initially it was the Meditech conversion or the handling of that, even though that the IT guy, Mr. Frank Sears himself admitted that he had never seen a supervisor be fired over problems with a technical conversion from one software program to another. And he has 51 IT personnel in that department who are responsible for handling that, but yet my client was held accountable for the problems that were encountered in a conversion process that took five years, by the way, and the lab at the hospital was the first to go through this process. But the ultimate issue in this case is the character of the reason for terminating the plaintiff is the ultimate question, and because proving that somebody's motive is difficult to prove is usually done by circumstantial evidence, we believe that we have produced evidence that the employer's motive was retaliatory. They stated a reason that they believe was non-discriminatory or non-retaliatory, but that doesn't necessarily absolve them of any liability in this case. The Zuclow case, which was also cited in the plaintiff's, the appellant's brief, says that in considering the element of causation, the ultimate issue to be decided is the employer's motive in discharging the employee. And because these cases are largely circumstantial, and rarely will an employer come right out and admit the actual reason that they terminated somebody was motivated by retaliation, obviously the plaintiff has to rely on circumstantial evidence. And do you have any further questions, Your Honor? I don't think so. Thank you, Mr. Gill. You'll have the opportunity for rebuttal. Thank you. Ms. Rowe? Thank you, Your Honor. May it please the Court? Counsel? Your Honor, just in case, I think you hit right on the issue. What's the genuine issue in this case? That is, has the plaintiff presented any evidence from which there can be a disputed fact about the motivation of the employer? She did not. As we pointed out in the appellee's brief on pages 9 to 11, in every evaluation from the time she started, there was an issue about her management style and skills. It is undisputed she was technically very competent. That is not the issue. She made an argument about that she should overthink. She should also take on the hearing lamp, and she did that. That became a problem, and Mr. Gill was right. There's no evidence that anybody actually quit, and that's because the CEO at Heron Hospital, Becky Ashton, said she has to be somewhere else. Get her out of Heron. That's when Mr. Maroney brought her back to Memorial Hospital. But you're arguing the circumstances in a different light than he is. He's talking about circumstantial evidence supporting a genuine issue of material fact, and you have to concede that despite the fact that there may have been a statement or two that her management style could use some perfecting, those were very high evaluations until they took the nosedive and following the self-help call. Well, let's look at that, Your Honor. The self-help call happened in 2003 after she'd been offered the severance, and there is no evidence that she was not going to accept. If she didn't accept the severance, she was going to be terminated. In fact, in the record on pages 200- Well, I would think that generally you get a severance offer. There is some hope by the employer that the employee will take you up on that. That's the whole idea, that you don't give a severance offer to your most valued employees. Absolutely. But when she didn't, what Mr. Maroney said was, okay, then just come back over here, go back to work, and gave her another two years working at the job, and then we get to the problem with Meditech, which I'll come back to in a moment. But in the plaintiff's own deposition, which is in the record at 488 and 489, she said she didn't have any evidence. It was absolutely, and I quote, absolutely my assumption. That's what Maroney wanted to do. He wanted to get rid of me, and that's what he was going to spend the next two years trying to get done. Let me ask you a question. Sorry. I think you in your brief conceded that the judge used the wrong timing for the reporting. You seemed to indicate that her reporting to the hotline, that protective activity, was merely one factual finding made by the court. Would you agree that prior to this separation agreement, that under the law, she was making calls to the kinds of supervisors that would come within the umbrella of, quote, protected activity? I could not, Your Honor. You do not. No, I do not, because I think she was in a position, at least arguably, but we don't contest that she didn't engage in protected activity in 2000. Oh, now you've answered it two different ways. Before she made the call. No, before she made the call, she's talking to Maroney. There's e-mails about the problems in the record. There's two e-mails. One, I think, was November 4th. And would you say that that kind of activity is protected activity? It certainly would be reasonable to say that, Your Honor. Yeah, I mean, she's talking to George Maroney, and then she's got another one dated October 20th and November 4th, and she's telling him about all the problems, Becky Ashton. That's protected activity, isn't it? Not disputing it's not. She went to the pursuit. She should have gone to Dr. Padmalaka. That was her direction. She went above Padmalaka, but regardless, the judge in this case seemed to think that the only protected activity that was engaged in was after the presentation of the severance, that is, the call. You would agree with me that she was doing protected activity before the call? Before the call. That's certainly reasonable.  Another question. Yes, ma'am. The burden of proof in your brief talks about it's her burden to prove that there was no causal connection. Really, at this stage, aren't we into a genuine issue of material fact? She should present, she should put actual evidence, not as we pointed out in our brief on pages 9 through 11. Her assumption, I'm sorry, later in her brief, actually on page 2, I believe. At least 17 different times when she said, I assume, I believe, I this, I that. Her speculation, her beliefs may be honestly felt. That's not evidence. That's not evidence of an actual factual, creating the factual dispute. It's her obligation to present factual evidence which would create that dispute. I'm sorry. I get that. But the other document I saw was that the call that she made to the hotline about the noncompliance and her concerns was actually investigated. It was. And it was determined that she was right. It was determined she was, that's not exactly correct. Okay. It was determined it was not compliant with their internal policies. The owner, the regulatory agency, rules and regulations were not compliant with it. They were not consistent with their own internal policies. So the recommendation was made that you've got to get Herron in line, right, with the others. Yes. And that was not concluded until May of 04? Correct. Okay. Thank you. Sure. Whether the judge is correct, whether Judge Thompson focused on the call in November of 2003 or not in the earlier time, the issue is we've got this two-year lapse. We've got two years. I have a judge who says, look, you didn't do anything until after they gave you the agreement. It seems to me that her judgment could have been clouded by that fact, regardless of the delay, because even you will agree she was wrong about that. But the standard that you hear here, Your Honor, is denotable. And there's a balanced summary judgment. That's the court's look. There's not an issue of fact presented by the plaintiffs for speculations, for assumptions about that two-year period. And what we actually have is her coming back, having her duties narrowed. She was in charge of the lab at just a singular hospital. Her salary was not reduced. Even though George Herron testified, it was really out of line and high for what her responsibilities were now. The problems continue. That's addressed by both Ms. Duberoni and Dr. Kadmohan, complaints of the employees. Finally, getting us to the proverbial straw that broke the camel's back, the Meditech implementation. And what the evidence is in the record is that there was training in Boston. She went. She didn't stay for the whole period of time. She came back. She delegated responsibilities to certain individuals, including Ryan Jones, and then just said it didn't get accomplished. Well, he went over to St. Joe's, and so he didn't get it done, but it's not my fault. She was the person responsible. There's not a bit of evidence to show that Moroni or anyone else, Dr. George Moroni or anyone else at the hospital, didn't believe this was the final straw. And again, like she was before, except for the very big distinction. In 2005, she was a senior person with a job that was important in wanting her to be able to go on. She was offered seventh grade, which is the highest when you have a senior person. Given the opportunities, it's just we gave you two years. It didn't work out. Here's the offer. And it again was made. She said no. This time, however, the difference is she was given a letter that said if you don't accept the offer, we're going to terminate it. That never happened in 2003. It was simply a verbal discussion when Ms. Moroni said, I don't think this will really work out. I don't see her having a long-term relationship with the institution. She said, I don't want to do it. He said, okay. And he testified, this is in the record, that he would give her another trial. She had two more years. The problems were not corrected. There's no more reporting of any protected activity. She doesn't claim she engaged in any additional protected activity. So, the case of the parenteralized, I'm sorry, the parentalized, the NUSP, says the distance and proximity isn't absolutely controlled. Although, the further away it gets, the inverse of the relationship. But the key to NUSP is it says you still have to have evidence of the motivation. That's what's lacking in this case. Any factual evidence presented on the field that creates an actual disputed fact. But when you have motivation, which is obviously a very nebulous issue that has to be proven, I mean, we look at the circumstances and join them together to see whether or not motivation has been proven. So, I think it's kind of unfair for you to say that she just kept saying in her deposition, it's my belief. Because that's all it would be when you're trying to tie it in with motivation. Unless they're going to say, I'm giving you this evaluation because I want to fire you in the future. Which, obviously, they're not going to say. Well, I disagree with that. Okay, go ahead. Tell me why. In the sense of, there could have been testimony from her staff or others who said it wasn't her problem. She didn't do this. Other people created problems that actually delayed this. And what she failed to tell you was that, yes, there was a long period of implementation on this Meditech. And every supervisor individually was asked, are we ready to go by? She was asked. The complainant was asked. The appellant was asked. Are you ready? The unit you're responsible? She said yes. And Mr. Sears testified. Had she said no, it wouldn't have gone forward at that time. They were trying to make sure everybody was in place, ready to go for this conversion. What was the timing of her pregnancy leave? Well, first of all, Your Honor, she never raised the issue of pregnancy. But as far as timing? Weren't they close together? I mean, she was off pregnant for a while while this was being implemented. I don't know when it was being implemented. Well, as Mr. Gill told you, this was a five-year implementation period. So I'm not sure where she was. That's to completion. But the lab was first. I think that was significantly before. But I know there's something in the records. I don't have that readily available. Thank you, Mr. Gill. I don't want you to waste your time on that, Ms. Rowe. That's right, Your Honor. Again, I think it's also important that the only alleged protected activity is in 2003, almost two years. And so when we recently take an inference, I don't think Mr. Gill has presented it. I don't believe I've ever seen something that says an employer lies in wait for two years, paying the kind of money it does, and offers a severance. This just has been working out for a period of two years, two months, five months, six months. Even in essence, it's talked about a year. At some point in time, an employer should be able to say, you know, okay, enough is enough. Even though you make me wait that long, we've got all these other problems. And they didn't have an obligation to offer a severance. They did. She didn't accept it. And she said she understood the consequences. I think that's much too elongated to have any established, any circumstantial fact of causal connection. No alleged complaint after 2003. Again, Mr. Gillian argues that because the employer said this is a, we had a non-protectional reason, just making that allegation creates a dispute of material fact. I still contend, Your Honor, that alone does not. There's evidence in the record as to why they had that opinion. Dr. Patty Watson, Mr. Maroney, even Bill Sherwood, who was the, and is the general counsel, argued that concern that Ms. Flake had stepped outside her boundaries of responsibility and attempted once again to rewrite his contract. Was he counsel with respect, general counsel? To the system. To the whole system. Yes, ma'am. So he would have been involved with, for example, drafting her severance letter, or do you know? I don't know his role in drafting the severance letter at all. Because he didn't seem to have a very good relationship with her from what I read. He said in 2003 when she tried to rewrite a contract they had with another agency, he wasn't going to deal with her directly. So that's the only evidence that's in the record. And just like the court with Judge Austin, the record before this court is devoid of any evidence to create the material that's being attacked. What was the memorandum that George Maroney issued attacking plaintiffs' integrity and veracity? Evidently several people were copied on it. Which memorandum? I'm sorry, Your Honor. I just, I picked it up from one of the briefs. The plaintiff claimed that George Maroney issued a memorandum attacking plaintiffs' integrity and veracity and copied several people on it. Maybe Mr. Gill can fill me in on that. I'm sorry, I don't have it. Do you have it? I don't. No, I think she's wondering what the memo is. It was. Yeah, I'll ask Mr. Gill. Okay. Any other questions, Your Honor? I don't think so. Thank you very much for your argument. Yes, ma'am. Mr. Gill, do you have rebuttal? Mr. Gill, do you know about this memorandum that was mentioned in your plaiting? Yeah, I'm not sure what the subject of that was, but it was totally unrelated to anything that the others that were copied on the, it was an email that went out from Maroney and several people were copied that were not involved in the, whatever the issue was. Was it disparaging to her? It was disparaging to plaintiffs, and I, for some reason I thought we had attached that to the. I didn't see it in your brief. I'm sure it's in the record, though. But maybe not. I just wanted to say, Your Honors, that the genuine issue of fact in this case is the employer's motive for discharging the plaintiff. Plaintiff alleges that the motive was in retaliation for her activities in 2003 leading up to the offer of severance on November 10th of 2003. They contend that they had some legal, non-discriminatory, non, I guess public policy, if you will, reason for discharging her, and obviously that's an issue of fact for a jury to determine. With regard to the protected activity, if you look at the Stebbings case, reporting to the supervisors within a company can be protected activity. That case is cited in the appellant's brief. Following the offer of the severance, the plaintiff was only asked to stay out of the Heron Hospital. Her duties were never changed. Her job title was never changed. Her pay was not decreased. But from that point forward, she had received pay increases every year for the first three years that she was there. She never got another pay raise for the remaining two years that she was employed by the defendant. Again, the distance of time is another question of fact as to whether or not they can show that their, whether or not the defendant can show that its motivation or reasons for firing or terminating the plaintiff's employment was not motivated by retaliation. Again, the hostile work environment, after the plaintiff declined to sign the severance, I think a reasonable inference is that the hostile work environment was created to force her to quit, to push her out, and she obviously didn't do that. And with regard to the other question the court had, the baby was due in April. She went on maternity leave starting March 20th of 2005, and that went to June 20th of 2005. The Meditech conversion, they went live, so to speak, on September 14th of 2005. And also, with regard to this issue about Bill Sherwood, who was the in-house counsel for SIH and the problem that he had with the plaintiff, this came about after the plaintiff mentioned to him that he had had this contract in his office for, I think it was two or three months, this is in the record. And he was upset with her because she was pushing him to get this contract out. Any further questions, Your Honor? I don't think so. Thank you. Thank you both for your briefs and arguments, and we'll take a minute under advisement to render a ruling in due course. This court will stand in recess until 1.30. All rise.